Robert **GILMAN**, Plaintiff,

v.

**Marvin T. RUNYON, Postmaster General,** Defendant.

Nos. 89 Civ. 1589 (HB), 89 Civ. 7572 (HB).

United States District Court, S.D. New York.

Oct. 18, 1994.

Shearman & Sterling, New York City (Robert Steinbuch, Grant J. Esposito, of counsel), for plaintiff.

Mary Jo White, U.S. Atty., S.D.N.Y., New York City (Deborah Y. Yeoh, Sarah Thomas, Asst. U.S. Attys., of counsel), for defendant.

### OPINION AND ORDER

BAER, District Judge.

Plaintiff Robert Gilman ("Gilman"), formerly employed by the United States Postal Service, alleges claims of retaliation discrimination against defendant Marvin T. Runyon, Postmaster General ("Postal Service") pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII").[1] Gilman claims that his supervisors Earlene Toole and Rudolph Rizzuto twice suspended him and finally discharged him for filing employment discrimination complaints against them. Defendant claims the supervisors suspended Gilman for failing to follow orders and for assaulting one employee and finally discharged him for assaulting another employee. The matter was tried before me without a jury on September 26, 27 and 28, 1994.

While I find that in light of the charged misconduct, the Postal Service discipline was severe, the law precludes me from second guessing the appropriate level of discipline. The law allows the Postal Service to discharge an employee provided it does not do so for a discriminatory reason. The single question then is whether his supervisors meted out the discipline because of Gilman's protected conduct, i.e., the complaints he filed alleging discrimination. I find they did not. Accordingly, I must dismiss Gilman's consolidated complaints.

1. See also Sumner v. U.S. Postal Service, 899 F.2d 203, 208 (2d Cir.1990). Plaintiff, a white Jewish male, abandoned his claims of discrimination based on race, religion and sex after trial began.

## Findings of Fact

Supervisors Rizzuto and Toole took three disciplinary actions against Gilman based on his misconduct: a seven-day suspension, a fourteen-day suspension, and a removal. Gilman claims the supervisors impermissibly disciplined him to retaliate for his Equal Employment Opportunity ("EEO") complaints and union grievances. Gilman filed many EEO complaints against his supervisors including six against Rizzuto between December 30, 1985 and July 21, 1988, and four against Toole between December 14, 1983 and July 21, 1988 (Amended Agreed Findings of Fact 16, 50 ("AAFF")). The EEO found no discrimination in any of Gilman's complaints. (AAFF 14, 17, 51). Gilman also filed numerous union grievances against Rizzuto and Toole, challenging employment conditions. (AAFF 18, 18a). Toole knew of these grievances. (AAFF 49).

The record abounds with evidence of Gilman's job related difficulties. For example, Gilman would lock fellow employees out of their work area and refuse to open the door. (Trial Transcript "Tr." 204–205). Several times Gilman took a phone away from a co-worker or supervisor while they were using it. (Tr. 210). A dozen of Gilman's co-workers complained to their supervisor in writing that Gilman caused "harassment and tension" and made their jobs "very unpleasant." (Joint Exhibit "JX" 11; Tr. 198). Supervisor Rizzuto, a Postmaster with 24 years experience, thought Gilman "tended to get people upset," was "unable to handle routine problems," and was a "pain in the neck" who "gets under people's skin." (Tr. 109, 112, 117, 152). Supervisor Toole who had 28 years of experience with the Postal Service thought Gilman "frightened" people, and said that if she did not discipline him for the first assault something "more traumatic will" happen. (Tr. 201, 212, 263).

### 1. Seven Day Suspension for Disobedience

Rizzuto testified credibly that he suspended Gilman on August 24, 1987 for seven days because he determined that Gilman twice refused to obey several orders of his supervisors. (Tr. 120, 121, 129, 130; JX 21). Rizzu-

to spoke to Gilman and the three supervisors whose orders Gilman disobeyed. Rizzuto based the suspension on Gilman's repeated refusal to comply with direct orders, delaying the mail, failing to conscientiously discharge duties, and being discourteous. (Tr. 129, 130, 131). Gilman admits that he refused to obey direct orders, but he claims his refusals were justified. (Tr. 36, 55–56, 59–60; Plaintiff's Proposed Findings "PPF" 21, 22; JX 34). Defendant proved that postal policy requires that employees obey orders such as these even if they disagree with them. Thereafter postal policy provides, they may submit objections to the orders through grievance channels. (JX 3, § 666.51 at 384; Tr. 133 (Rizzuto); Tr. 66 (Gilman)). Gilman failed to prove by a preponderance of the evidence that Rizzuto suspended him in retaliation for his complaints.

### 2. Fourteen Day Suspension for the Elevator Incident

Toole testified credibly that she suspended Gilman on December 7, 1987 for fourteen days for assaulting Alice Woods, whom Gilman allegedly shoved while exiting an elevator. (Tr. 189–195). Toole obtained factual statements from a supervisor on the scene, Gilman, Woods, and Postal Inspectors. (Tr. 190–192). Rizzuto concurred in the suspension. (JX 22). Gilman testified that he had not shoved Woods, but that she had run into him. (Tr. 38; PPF 28–33). In my view Toole and Rizzuto based Gilman's suspension on credible evidence that plaintiff was to blame for the collision. Gilman again did not prove by a preponderance that Toole and Rizzuto suspended him in retaliation for his complaints.

### 3. Termination for the Desk Incident

Toole terminated Gilman's employment as of June 4, 1988, after she determined that Gilman assaulted and injured Florence Borick by shoving his desk into Borick's chair, pinning her between her chair and desk. (JX 18, 19, 20, 23, 25). Toole interviewed Gilman, Borick, and various eyewitnesses and obtained their written statements. (Tr. 242–246; JX 25). Gilman claims that Borick caused the desk shoving incident. (JX 25).

Defendant clearly demonstrated that Toole relied on credible evidence that Gilman caused the desk incident as well as his prior offenses in deciding to terminate Gilman. Gilman did not prove by a preponderance that Toole and Rizzuto fired him in retaliation for his complaints.

## DISCUSSION

### A. *The Legal Standard*

■ The three step process established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973) governs the evidentiary burdens in Title VII cases. *See also Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *St. Mary's Honor Ctr. v. Hicks*, — U.S. —, —, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993).[2] First, plaintiff has the burden of proving a *prima facie* case of discrimination by a preponderance of the evidence. *See St. Mary's Honor Ctr.*, — U.S. at —, 113 S.Ct. at 2752. Second, if plaintiff establishes a *prima facie* case, the burden shifts to defendant "to articulate some legitimate, nondiscriminatory reason" for defendant's actions. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093 (quoting *Green*, 411 U.S. at 802, 93 S.Ct. at 1824). This burden of articulation or production does not require defendant to prove an absence of a discriminatory motive. *St. Mary's Honor Ctr.*, — U.S. at —, 113 S.Ct. at 2749. Defendant "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus" or raise "a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254–55, 257, 101 S.Ct. at 1094, 1096.

Finally, plaintiff has the burden of proving by a preponderance of the evidence that the legitimate reason proffered by defendant is not the true reason, but is instead a pretext for discrimination. *Burdine*, 450 U.S. at 256,

101 S.Ct. at 1095. Plaintiff must prove discrimination "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* "[I]t is plaintiff's task to demonstrate that similarly situated employees were not treated equally." *Id.* at 258, 101 S.Ct. at 1096. Plaintiff, at all times, has the ultimate burden of persuading the trier of fact that defendant intentionally discriminated against him. *St. Mary's Honor Ctr.*, — U.S. at —, 113 S.Ct. at 2749.

■ To establish a *prima facie* case of retaliation, Gilman must show: (i) activities protected under Title VII; (ii) employer knowledge of the activities; (iii) the employer's adverse action against Gilman; and (iv) a causal connection between the protected activities and the discipline, rather than that other factors contributed to the adverse employment action. *See, e.g., Sands v. Runyon*, 28 F.3d 1323, 1331 (2d Cir.1994); *Saulpaugh v. Monroe Comm. Hosp.*, 4 F.3d 134 (2d Cir.1993); *Manoharan v. Columbia Univ. Col. of Phys. & Surgeons*, 842 F.2d 590, 593 (2d Cir.1988); *Davis v. State University of New York*, 802 F.2d 638, 642 (2d Cir.1986).

### B. *Conclusions of Law*

■ The record contains little evidence that Toole and Rizzuto knew of the EEO complaints and none that the suspension and dismissal resulted from such knowledge. In short, Gilman failed to establish the "causal connection" element of his *prima facie* case. Gilman's failure of proof relieved defendant of any "burden of production." Nonetheless, defendant articulated legitimate nondiscriminatory reasons for the disciplinary actions. Defendant does not dispute that Gilman's filing of EEO complaints constitutes "protected activity" or that the supervisors "took adverse action" by suspending and terminating him. Defendant denies that Gilman's union grievances constitute protected activi-

---

**2.** Plaintiff's post-trial memorandum argues alternatively that *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) should govern this case. However, the *Price Waterhouse* test is properly applied only after a

finding that plaintiff has proven discrimination through direct evidence. *Grant v. Hazelett Strip–Casting Corp.*, 880 F.2d 1564, 1568 (2nd Cir. 1989). Gilman has proffered no direct evidence of retaliation discrimination.

ty. I need not decide whether the union grievances are protected activity because even assuming that they are, Gilman still has not proved causation. Similarly, I need not decide whether Gilman proved that his supervisors knew of his EEO complaints at the time they disciplined him. Even with proof of knowledge plaintiff has failed to carry the day. Knowledge alone does not prove retaliation. An employer's knowledge of an employee's protected activity,

> without more, cannot itself be sufficient to take a retaliation case to the jury. Were the rule otherwise, then a disgruntled employee, no matter how poor his performance or how contemptuous his attitude toward his supervisors, could effectively inhibit a well-deserved discharge by merely filing, or threatening to file, a discrimination complaint.

*Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 828 (1st Cir.1991); *see Jackson v. St. Joseph State Hosp.,* 840 F.2d 1387, 1391 (8th Cir.) ("complainant [who files a complaint is not clothed] with immunity for past and present inadequacies, unsatisfactory performance, and uncivil conduct in dealing with subordinates and with his peers"), *cert. denied,* 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988).

■ Gilman offered no direct evidence of causation. Absent direct evidence a Title VII plaintiff can prove the causal connection element of her *prima facie* case indirectly where the adverse employment action closely follows her protected activity. *Manoharan,* 842 F.2d at 593. Gilman filed so many EEO complaints that some of them were bound to precede his suspensions and termination. This, however, proves little. For example, Gilman filed only one EEO complaint against Toole before she suspended him in December of 1987. Gilman had filed that complaint four years before the suspension and it had long since been dismissed. One month and again six months after that suspension Gilman filed further EEO complaints against Toole. A time graph suggests that Gilman sought to retaliate against Toole by filing complaints against her following the suspension, rather than vice-versa.

■ A Title VII plaintiff can also indirectly prove causal connection by showing "a similarity between her conduct and that of non-protected employees who were treated differently." *Williams v. Casey,* 691 F.Supp. 760, 767 (S.D.N.Y.1988). Gilman's efforts to raise such an inference failed. The allegedly analogous employees were not supervised by Toole and Rizzuto, did not work in the same division of the Postal Service, held different positions, had different disciplinary records and conducted themselves differently from Gilman. (JX 45, 46). Gilman argues that the supervisors discriminated against him because Woods and Borick received lesser discipline. Not so. Woods and Borick were not "similarly situated" to plaintiff because they had, among other things, different supervisors, held different positions, and Toole had determined that Gilman was responsible for the assaults. *See Morgan v. Mass. Gen. Hosp.,* 901 F.2d 186, 191 (1st Cir.1990) ("evidence that the co-worker[s] w[ere] not discharged is insufficient to sustain [plaintiff's] burden with regard to pretextuality"). In other words:

> Employees are not "similarly situated" merely because their conduct might be analogized. Rather, in order to be similarly situated, other employees must have reported to the same supervisor as the plaintiff, must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's, without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it.

*Mazzella v. RCA Global Comm'ns, Inc.,* 642 F.Supp. 1531, 1547 (S.D.N.Y.1986), *aff'd mem.,* 814 F.2d 653 (2d Cir.1987).

■ Defendant presented credible evidence that Rizzuto and Toole disciplined Gilman for legitimate business reasons. Gilman has not adduced convincing evidence that their decisions were pretextual. Although Gilman attempted to demonstrate pretext through purported procedural irregularities in the investigation of the assault that led to his removal, his own expert could not definitely identify any rules or regulations appli-

cable in the New York Division of the Postal Service that were breached. (Tr. 359) (Richardson). The sole inquiry in a Title VII case is whether the given reasons for discharge mask unlawful discrimination. *Judge v. Marsh,* 649 F.Supp. 770, 781 (D.D.C.1986). As I noted earlier, it is not the fact finder's function "to second guess business decisions or to question [an employer's] means to achieve a legitimate goal." *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1116 (2d Cir.1988).

> Evidence that an employer made a poor business judgment in discharging an employee generally is insufficient to establish a genuine issue of fact as to the credibility of the employer's reasons.... Thus, the reasons tendered need not be well-advised, but merely truthful.

*Id.,* (citations omitted).

 Nor should the fact finder assess whether the employer's decision was erroneous or even rational, so long as the employer's actions were not taken for a discriminatory reason. *See Mesnick v. General Elec.,* 950 F.2d 816, 825 (1st Cir.1991) ("Courts may not sit as super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory business reasons") (citing *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978)), *cert. denied,* —— U.S. ——, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992); *Nix v. WLCY Radio/Rahall Comm'ns,* 738 F.2d 1181, 1187 (11th Cir.1984) ("The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."); *Verniero v. Air Force Acad. School Dist.,* 705 F.2d 388, 390 (10th Cir.1983) (" '[i]t is not the duty of a court nor is it within the expertise of the courts to attempt to decide whether the business judgment of the employer was right or wrong' "); *Judge,* 649 F.Supp. at 781 (an "employer's judgment in selecting and applying subjective criteria may be poor, and it may be erroneous" as long as it is not discriminatory); *Wade v. New York Tel. Co.,* 500 F.Supp. 1170, 1176 (S.D.N.Y.1980) ("[a]n employer may discharge a worker unwisely,

irrationally, or for no good reason; [h]e is forbidden under Title VII only from discharg[e] ... based on [discrimination]").

 Gilman's argument that an adverse inference should be drawn against defendant because the witnesses to the assaults were not called to testify, is misplaced. Those witnesses would not have provided relevant testimony because the inquiry here is not whether Supervisors Rizzuto and Toole made the correct business decision, but the absence of any discriminatory motive. *Cf. NLRB v. Chester Valley, Inc.,* 652 F.2d 263, 271 (2d Cir.1981) (no adverse inference can be drawn from nonproduction of witness where party has reason to believe that opponent has not met its burden of proof).

 In other words, "Title VII is not a shield against harsh treatment in the work place." *Jackson v. City of Killeen,* 654 F.2d 1181, 1186 (5th Cir.1981); *see also Davis v. State Univ. of N.Y.,* 802 F.2d 638, 641 (2d Cir.1986) ("The employer need not prove that the person promoted had superior objective qualifications, or that it made the wisest choice, but only that the reasons for the decision were nondiscriminatory."); *Powell v. Syracuse Univ.,* 580 F.2d 1150, 1156–57 (2d Cir.) ("the law does not require ... that employment be rational, wise, or well-considered—only that it be nondiscriminatory"), *cert. denied,* 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978); *Sullivan v. Boorstin,* 484 F.Supp. 836, 842–843 (D.D.C.1980) ("Absent discrimination, the choice of discipline is a matter left to the employer's best business judgment in light of all considerations.").

### CONCLUSION

The evidence demonstrates that Gilman's improper behavior in the work place, and not his protected activity, led to his suspensions and removal. For all the reasons set forth above, I dismiss the complaints.

**SO ORDERED.**